## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

WILLIAM C. DEAN,                    :

    Plaintiff,                  :
                             Case No. 3:08cv00267

 vs.                              :

                             District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,                 :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,           :

    Defendant.                  :

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

    Various health problems led Plaintiff William C. Dean to file an application with the Social Security Administration seeking Disability Insurance Benefits (DIB).  He asserted through his DIB application that beginning on December 31, 2003 his health problems prevented him from working.

    The Social Security Administration denied Plaintiff's DIB application at each stage of administrative review including, most notably, through the written decision of Administration Law Judge (ALJ) Daniel R. Shell.  (Tr. 13-24).  ALJ Shell concluded that Plaintiff was not under a "disability" as defined by the Social Security Act and was therefore ineligible to receive DIB.  *Id.*  There is no dispute in this case that the Court has jurisdiction to review ALJ Shell's decision.  *See* 42 U.S.C. §405(g).

    The case is presently before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

(Doc. #14), the administrative record, and the record as a whole.

Plaintiff seeks an Order remanding this case to the Social Security Administration for payment of benefits or, at a minimum, a remand for consideration of the combined impact all of his severe impairments have on his ability to work.

The Commissioner seeks an Order affirming the ALJ's decision.

## II.    ADDITIONAL BACKGROUND

### A.    <u>Plaintiff and His Hearing Testimony</u>

Plaintiff was forty-three years old on his claimed disability onset date. He is consequently considered a "younger individual" for purposes of resolving his DIB application. *See* 20 C.F.R. §404.1563(c); *see also* Tr. 23. He has a limited education. (Tr. 23, 394). He has worked in the past in general labor jobs and in shipping and receiving jobs. (Tr. 83, 417).

During the ALJ's hearing Plaintiff testified that he could no longer work as of December 31, 2003 because he was no longer able to walk or sit for long, and he needed to lay down a lot. (Tr. 394). He explained that some of the prescription drugs he took for pain caused him to be tired. *Id.* He further explained:

> I ended up having a lot of problems with my back, pains in my back, and ... the biggest problem was I started having numbness in my arms. When I went to the doctor for that, to find out why I was having the problems with the numbness and stuff, they had done a check on me on the nerves, and found that I had root nerve damage. Then after that, with the x-rays and MRIs, they found out what was really the problem, and it ended up getting a lot worse after that, with the inability to walk and sit for very long.

(Tr. 395). He stated that doctors diagnosed him with degenerative disc and joint disease and osteoarthritis. *Id.* And, he said, "There's some other problems with my feet." *Id.*

Plaintiff testified, "when I start having trouble with ... my neck, because I've got some cervical problems, it requires me to lay down. There's no way to relieve that, unless I lay back or down." (Tr. 397). This problem limits him to 10 or 15 minutes of

sitting at a time. *Id*. According to Plaintiff, during an 8-hour day he would spend one-half the time or more lying down. (Tr. 398). Plaintiff uses a cane to walk short distances and normally needs to use a wheelchair if he must walk more than 20 feet. *Id*. If he stands too long, his feet, knees, and back "will cause [him] problems" and will force him to sit. (Tr. 399). He has a lot of numbness in his legs as well as his arms. *Id*. He can stand/walk for 10 to 15 minutes. (Tr. 400).

Plaintiff also struggles with depression and has received mental health counseling. (Tr. 400-01). He testified:

> It's been very difficult for me to accept what's been going on with me. I was a very active person, very physical, and it's been difficult for me to accept what's going on, and it was hard for me to go see them [mental health counselors]. You know, I didn't really want to accept this, but – and, you know, my family's had to put up with a lot, with me having to deal with it. I finally went to seek some help for it.

(Tr. 401). His depression involves feelings of sadness, helplessness, and hopelessness. (Tr. 403). It also causes him some short-term memory problems. *Id*.

### B.    Additional Evidence

### 1.
### Dr. Murray

George Murray, D.O. began treating Plaintiff in April 2003. *See* Tr. 251. In July 2003 Dr. Murray wrote a letter stating that Plaintiff had been recently diagnosed with cervical degenerative disc disease and degenerative joint disease, involving multiple levels of his cervical spine. (Tr. 248). Dr. Murray noted that these conditions caused Plaintiff to experience radicular parethesias (numbness or tingling[2]) in his right upper arm. *Id*. He was treating Plaintiff conservatively with physical therapy, and he precluded Plaintiff from heavy lifting, no more than 10 to 15 pounds on any given occasion, with no

---

[2] *See* Taber's Cyclopedic Medical Dictionary at 1518 (19th Ed. 2001).

lifting above his head, no repetitive reaching, and no pulling or grasping objects above his head. *Id.*

Over the next few years Plaitniff continued to see Dr. Murray. In August 2005 Dr. Murray prescribed a standard wheelchair for Plaintiff based on diagnoses of lumbar degenerative disc disease and lumbar degenerative joint disease, causing Plaintiff low back and leg pain. (Tr. 229).

In May 2006 Dr. Murray wrote a detailed report concerning Plaintiff's "cervical and lumbar degenerative disc disease and degenerative joint disease." (Tr. 312). Dr. Murray noted that he began treating Plaintiff in July 2003 for complaints of pain and paresthesias in his right upper arm. Dr. Murray then provided information about objective test results, including a spinal MRI revealing a central disc protrusion at C5-6, a broad disc bulge at C6-7, and degenerative disc disease at C5, C6, and C6-7. *Id.* An aggressive course of physical therapy provided only minimal improvement. Dr. Murray noted that a neurosurgeon had discussed with Plaintiff the possibility of undergoing surgery – a cervical fusion – but "Plaintiff did not wish to consider something as drastic as spinal surgery at that point in time." (Tr. 312).

Dr. Murray explained that in September 2003 Plaintiff still experienced ongoing low-back and cervical pain. An MRI of his lumbar spine revealed disc protrusions at L3, L4, and L5 with osteophyte formations at L5-S1. Dr. Murray reported that Plaintiff "was having associated paresthesias and weakness of his lower extremities at this time." (Tr. 312). About fourteen months later, in November 2004, additional MRIs of Plaintiff's lumbar and cervical spine confirmed the results of the September 2003 MRI, according to Dr. Murray. *Id.*

Dr. Murray also explained, "Plaintiff is unable to walk without the assistance of a cane. He requires the use of a wheelchair which he has purchased on his own for traversing any long distances. He requires the use of chronic narcotic pain medications which at this point only modestly improve his pain symptoms. He has also suffered

worsening symptoms of depression as a result of his chronic pain syndrome. He is currently taking Lexapro 10 mg daily which is an antidepressant." (Tr. 313).

Dr. Murray opined, in part, that Plaintiff was unable to perform has past job. *Id*. Plaintiff was limited to occasionally lifting up to 10 pounds and frequently lifting no more than 10 pounds. *Id*. He believed that Plaintiff's ability to stand and walk is "significantly impaired" to the extent he could only stand and walk two to three hours per day. *Id*. Dr. Murray concluded his report as follows:

> Mr. Dean experiences chronic pain on a daily basis. I believe this pain is a direct result of the conditions which have been noted and documented on his previous imaging studies including x-rays, MRI studies, and EMG tests. All of these studies and findings are well documented throughout his medical record....

(Tr. 313).

## 2.
## Dr. West

In December 2004 Plaintiff underwent a consultative examinations by Scot West, D.O. (Tr. 161-62). Dr. West noted that Plaintiff was taking Darvocet and Vicodin for pain. Plaintiff reported posterior cervical pain radiating into his intrascapular region and into his right shoulder but he denied experiencing arm pain. (Tr. 161). Plaintiff also described low-back pain radiating his hips and buttocks but he denied any true radicular leg pain. *Id*. Dr. West documented numerous findings upon his examination including, for instance, palpable tenderness in his lower lumbar region and posterior cervical musculature; range of motion testing showed cervical flexion limited to 15 degrees, extension limited to 5 degrees, rotation limited to 40 degrees right and 60 degrees left. (Tr. 161-62). Dr. West reviewed Plaintiff's lumbar MRI dated November 18, 2004, which was essentially normal. (Tr. 162). He reviewed Plaintiff cervical MRI done on the same date, "which demonstrated the primary problem to be cervical spondylosis at the C6-7 level with some right sided nerve root impingement. There were lesser changes at the C5-6 level without cord compression or nerve root compression." (Tr. 162).

Dr. West's impressions were cervical spondylosis at C6-7 and low back pain with negative lumbar MRI. *Id.* He discussed with Plaintiff the possibility of undergoing surgery at the C6-7 level, but Dr. West noted that he did not see any surgical defect in Plaintiff's lower lumbar region. *Id.*

### 3.
### Dr. Duritsch

In April 2006 Dr. Stephen Duritsch examined Plaintiff at the request of the Ohio Bureau of Disability Determinations. (Tr. 272-81). Based on his examination findings and observations, and upon a review of Plaintiff's medical records, Dr. Duritsch listed the following clinical assessments/impressions:

1. Neck pain, likely secondary to cervical osteophyte formation and cervical myofascial pain.[3]

2. Low back pain, secondary to lumbar myofascial pain.

3. Thoracic pain, secondary to thoracic myofascial pain.

4. History of right carpal tunnel syndrome with no active findings on today's examination.

5. Bilateral knee crepitation consistent with chondromalacia.

(Tr. 273). Dr. Duritsch also completed a Medical Source Statement, opining that Plaintiff could occasionally lift/carry 25 pounds; frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour workday; and occasionally climb, balance, kneel, crouch, crawl, or stoop. (Tr. 278-29). Dr. Duritsch noted that Plaintiff had no limit on his ability to sit. (Tr. 279). If fully credited, Dr. Duritsch's opinions limit Plaintiff to a limited range of light work.[4]

---

[3] "Myofascial pain" refers to pain in the muscles and surrounding fibrous membranes. *See* Taber's at 743-44, 1348.

[4] Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

Dr. Duritsch also observed the following:

> The claimant propelled himself in his wheelchair. It appears that the wheelchair is brand new and is not worn at all. He is able to independently transfer from the wheelchair to the scale and stand easily. He is able to walk to the exam table. He is able to stand on the scale with 5/5 strength. He refuses to stand on his tiptoes. He walked a short distance in the room with no gait abnormalities. He was able to sit comfortably during the entire portion of the examination in an unsupported position on the examination table.

(Tr. 273). Dr. Duritsch noted, in part, that Plaintiff's "use of the wheelchair, in my opinion, is not obligatory." *Id*.

## 4.
## Plaintiff's Wife's Affidavit

To counter some of the statements in Dr. Duritsch's report, Plaintiff submitted his wife's affidavit to the ALJ. (Tr. 52-56). Plaintiff's wife states in her affidavit that she was present when Dr. Duritsch examined Plaintiff and that Dr. Duritsch's report is factually erroneous on several points. (Tr. 55). She explained in part:

> "A. Dr. Duritsch reported: 'The claimant propelled himself in his wheelchair ... he uses a rented wheelchair. It appears the wheelchair is brand new and is not worn at all.'
>
> What actually happened: The wheelchair is prescribed, bought and paid for, it was purchased ... 6 months prior to this doctor visit.... My husband rarely goes anywhere due to pain. He especially doesn't go out in winter for fear of falling on ice and snow, so therefore it is still in new condition. Bill did not 'propel' himself in the wheelchair, I pushed him.
>
> B. Dr. Duritsch reported: '[Plaintiff] is able to independently transfer from the wheelchair to the scale and stand easily ... he is able to stand on the scale with 5/5 strength ... he weighs 289 pounds to my measurement today....'

What actually happened: Bill never got on any scales. If Bill had, Dr. Duritsch would have recorded his weight at 215 lbs., not 289 lbs. Bill did not stand on the scales with 5/5 strength because he never stood on the scales at all.

C.  Dr. Duritsch reported: '[Plaintiff] is able to walk to the exam table. He walked a short distance in the room with no gait abnormalities.'

What actually happened: I do not know how Dr. Duritsch would have seen his gait, considering Bill never walked anywhere. The wheelchair was next to the exam table. When Bill had to get there, he pivoted, he did not walk.

* * *

E.  Dr. Duritsch reported: '[Plaintiff] denies any radiating pain, numbness or tingling ... He denies any pain radiating to his lower limbs. He denies any numbness or tingling.'

What actually happened: The doctor did not ask those questions. I do recall Bill telling him that he can move and [it] cause[s] instant numbness and tingling. Bill has never denied numbness and tingling, which is even in the MRI report from 2004. I also recall Bill explaining that while the Darvocet takes the edge off the constant pain, it does not help at all with the sharp pains (radiating)."

(Tr. 55-56). Plaintiff's wife also stated that Dr. Duritsch's examination of Plaintiff took less than 15 minutes. (Tr. 56).

## 5.
## Dr. Hutson

During the ALJ's hearing, a medical expert, Dr. Hutson, testified about his review of the record. (Tr. 405-17). He opined that Plaintiff was capable of performing light work. (Tr. 410-11). Dr. Hutson also testified that he agreed with Dr. Duritsch's opinions. (Tr. 411). But he disagreed with Dr. Murray's opinions, explaining, "He makes all these statements here, Judge, but there's nothing objectively, from a medical standpoint, to back this up, except for chronic pain, which is a subject complaint." (Tr. 412). Dr.

Hutson explained:

> There is no evaluation by Dr. Murray. There's opinions by Dr.
> Murray after talking with his patient. There's nothing in here ... [b]y way of
> any objective examination to allow him to arrive at his opinions, other than
> subjective complaints of pain.

(Tr. 414-15). The following exchange then occurred:

| [Plaintiff's counsel]: | Dr. Murray is the one that had some of the MRIs, and caused those to be done, isn't that true, Doctor? The MRIs, and the CAT scans, and all that kind of stuff. Those are objective tests. |
|---|---|
| [Dr. Hutson]: | Not unless there's clinical correlation, sir. No, they're not. |
| [Plaintiff's counsel]: | Well, they're – an X-ray is an objective test, for example. |
| [Dr. Hutson]: | Yes, it is, but you've got to correlate it with clinical ... function. |

(Tr. 416-17). Then, when asked if degenerative disc disease can cause the kind of pain Plaintiff testified to, Dr. Hutson answered, "Yes." (Tr. 417).

Dr. Hutson acknowledged that Dr. Duritsch's report stated Plaintiff's weigh at 289 pounds, which was way off. (Tr. 413). Dr. Hutson further acknowledged that the reliability of Dr. Duritsch's report would be reduced if Dr. Duritsch did not actually examine Plaintiff as reported; for example, if – contrary to his report – Dr. Duritsch had not required Plaintiff to stand on the scale and did not require him to walk. (Tr. 414).

## 6.
## Dr. Nims

Plaintiff began seeing psychiatrist Dr. Nims on March 16, 2006. (Tr. 327). Several months later, in July 2006, Dr. Nims completed a form titled, "Medical Source Statement," opining that Plaintiff had a limited and unsatisfactory ability to perform 11 out of 14 mental work activities including, for example, no ability to maintain attention for extended periods of 2-hour segments, no ability to maintain regular attendance and be

punctual within customary tolerances, no ability to sustain ordinary routine without special supervision, and no ability to work in coordination with or in proximity to others without being unduly distracted by them. (Tr. 325-26). Dr. Nims further believed that Plaintiff had a limited and unsatisfactory ability to complete a normal workday and normal workweek without interruptions from psychologically-based symptoms. (Tr. 326). Dr. Nims explained briefly that he based his opinions on his observations and on Plaintiff's responses during their regular sessions. (Tr. 327). And Dr. Nims noted that he did not know if Plaintiff's mental health condition had existed and persisted since December 31, 2003. *Id.*

In July 2006 and through the remaining months of 2006, Plaintiff received mental health counseling from therapists who practiced with Dr. Nims. (Tr. 339-64). On December 28, 2006, Dr. Nims completed another Medical Source Statement again opining that Plaintiff had a limited and unsatisfactory ability to perform 11 out of 14 mental work activities. (Tr. 365-67). He again explained that he based his opinions on observations and Plaitniff's responses during individualized counseling sessions. (Tr. 367). And he again noted that he did not know if Plaintiff's mental health condition had existed and persisted since December 31, 2003. *Id.*

## III.    THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d

270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity,[5] can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

---

[5] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

## IV. ALJ SHELL'S DECISION

ALJ Shell conducted the required five-step sequential evaluation, concluding as follows:

Step 1:    Plaintiff had not engaged in any substantial gainful activities since his claimed disability onset date of December 31, 2003.

Step 2:    Plaintiff suffered from the severe impairments of depression, degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine at the C5-6 and C6-7 levels, cervical spondylosis, cervical disc herniation at the C6-7 level, and carpal tunnel syndrom in both wrists.

Step 3:    Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria of the Listings.

Step 4:    The ALJ explained:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the exertional and non-exertional requirements of basic work activities except for lifting, pushing and pulling more than 10 pounds frequently and up to 25 pounds more than occasionally; standing and/or walking for more than a total of about 6 hours in an 8-hour workday (exertional); climbing ramps, stairs, ladders, ropes, and scaffolds more than occasionally; balancing, stooping, kneeling, crouching, and crawling more than occasionally; or more than low stress work (i.e., no direct dealing with the general public, no production pace work, or over-the-shoulder [sic]) (non-exertional).

Step 4:    Plaintiff was unable to perform any of his past relevant work.

Step 5:    Plaintiff could perform a significant number of jobs existing in the national economy.

As a result of the ALJ's findings throughout his sequential evaluation, he concluded that Plaintiff was not under a disability and not eligible for DIB. (Tr. 13-24).

## V. JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative

record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence. *Rogers*, 486 F.3d at 241; *see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id*. For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id*. (and cases cited therein).

## VI.    DISCUSSION

### A.    The Parties' Contentions

Plaintiff's Statement of Errors lists fourteen mistakes made by the ALJ, several of which are significant.

First, Plaintiff contends that the ALJ erred by crediting Dr. Duritsch's opinions

when the unrebutted affidavit of Plaintiff's wife documented that Dr. Duritsch's examination was inadequate and his report contained factually erroneous observations. Given this, Plaintiff further asserts that the ALJ had some duty to at least seek some rebuttal evidence from Dr. Duritsch about the reliability and accuracy of his report. Noting that the ALJ rejected the affidavit of Plaintiff's wife because it was offered as a "medical opinion" when it was not offered as a "medical opinion" but was instead offered to attack some of the factual observations Dr. Duritsch noted in his report.

Second, Plaintiff contends that the ALJ erred by not placing controlling weight on the opinions of his treating medical sources – Dr. Nims as to his mental limitations and Dr. Murray as to his physical limitations.

Third, Plaintiff contends that the ALJ erred by failing to fully consider all of the limitations caused by Plaintiff's mental impairments, and he emphasizes that the vocational expert testified that such limitations would eliminate all competitive employment.

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff was not under a disability because he could perform a significant number of jobs available in the national economy. The Commissioner further argues that the ALJ properly weighed the medical evidence of record, properly relied on Dr. Duritsch's opinions and on the opinions of the state agency reviewers, and correctly rejected the opinions of Drs. Nim and Murray. And the Commissioner concludes in part, "The ALJ accepted that Plaintiff had degenerative disc disease and other impairments, but he reasonably found that Plaintiff was not as limited as alleged and that he retained the residual functional capacity to perform a reduced range of low-stress light and sedentary work during the relevant time period." (Doc. #13 at 13-14).

### B.    Medical Source Opinions

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a

nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

### C.   Analysis

At Step 4 of the sequential evaluation, the ALJ discussed his evaluation of the medical source opinions, beginning with the statement, "The opinions were considered evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs [Social Security Rulings] 96-2p, 96-5p, and 06-3p." (Tr. 17).

The ALJ did not separately describe the legal criteria he applied to evaluate the medical source opinions. *See* Tr. 13-24. This omission did not by itself constitute an error of law. But it creates the need to scrutinize the ALJ's decision to determine what legal criteria he actually applied. This scrutiny is needed to resolve whether or not the ALJ applied the correct legal criteria to the medical source opinions. *Cf. Bowen*, 478 F.3d at 746 ("This court will uphold the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal criteria.").

The ALJ reviewed Dr. Murray's records and opinions in detail. (Tr. 20). He rejected Dr. Murray's restriction of Plaintiff to a ten-pound lifting limit as "not based on objective medical evidence but only on subjective statements." (Tr. 22). The ALJ further relied on Dr. Hutson's disagreement with Dr. Murray's opinions. *Id*. And the ALJ fully credited the opinions of Dr. Duritsch. *Id*. The ALJ further wrote:

> As for the opinion evidence, greater weight is given the opinion of Dr. Boerger for the claimant's mental limitations. He had the opportunity to examine the claimant personally and his opinion is generally consistent with that of the State Agency consultants and the clinical findings of Dr. Nims, Ms. Caldwell, and Mr. Buckner. While Dr. Duritsch's opinions may not be entitled to controlling weight, here, greater weight is given to the opinion of Dr. Duritsch, as most of his clinical findings are consistent with the objective evidence of record, as discussed in detail above.

(Tr. 22).

A review of this section, *id*., of the ALJ's decision as well as the ALJ's entire discussion of the medical source opinions reveals that he did not apply the correct legal criteria when rejecting Dr. Murray's opinions and when crediting the contrary opinions of

Dr. Hutson.  The ALJ did not identify the presumption that a treating physician's opinion is generally given controlling weight and did not discuss why this general presumption did not apply to Dr. Murray's July 2006 opinions.  *See* Tr. 21-23.  At most the ALJ applied one regulatory factor – the lack supporting objective medical evidence – to discard Dr. Murray's opinions.  Applying an isolated regulatory factor in this manner constituted legal error, because the ALJ failed to apply the two-step weighing procedure mandated by the Regulations.  As explained above, *supra*, §VI(B), the ALJ must first consider whether controlling weight is due under the treating physician rule – the legal criteria in §404.1527(d)(2).  *See Rogers*, 486 F.3d at 242.  Then, "[w]hen the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *See id*.

The Court of Appeals emphasized in *Rogers*:  "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status nothwithstanding."  486 F.3d at 242; *see Wilson*, 378 F.2d at 544.  Because the ALJ rejected Dr. Murray's opinions based on a single, isolated regulatory factor and because the ALJ's decision does not otherwise indicate that he applied the correct legal criteria to reject Dr. Murray's opinions, the ALJ erred as a matter of law.  *See* Tr. 16-22; *see Rogers*, 486 F.3d at 242; Social Security Ruling 96-2p, 1996 WL 374188 at *4 ("Adjudicators must remember that a finding that a treating source's medical opinion is not well-supported by medically acceptable clinical and laboratory techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527....").

In addition, the ALJ's reason for rejecting Dr. Murray's opinion – the absence of supporting objective medical evidence – is not supported by substantial evidence. This is so because throughout Dr. Murray detailed report he relied on objective medical tests results such as a the results of a spinal MRI revealing a central disc protrusion at C5-6, a broad disc bulge at C6-7, and degenerative disc disease at C5, C6, and C6-7; and an MRI of his lumbar spine revealed disc protrusions at L3, L4, and L5 with osteophyte formations at L5-S1; and additional MRI results some fourteen months later (in November 2004). (Tr. 312). Given this objective medical evidence, no reasonable person could accept the ALJ's finding that no such evidence supported Dr. Murray's opinion, and as a result, substantial evidence does not support this finding by the ALJ.

In reaching this finding, and when rejecting Dr. Murray's opinion, the ALJ appeared to rely on the opinions of Dr. Hutson, who did not place any significance on these objective medical test results. *See supra*, §II(B)(5). The ALJ, however, erred as a matter of law by failing to evaluate Dr. Hutson's opinions under any of the regulatory factors mandated by the Regulation and by the Commissioner's own Rulings. *See* Tr. 16-22. The ALJ made this same error with regard to Dr. Duritsch's opinions. *See id.* This constituted a failure to apply the correct legal criteria because the Regulations and Rulings required the ALJ to weigh the opinions of one-time examining physicians and record-reviewing physicians under the regulatory factors, including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180. The Regulations appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

Next, as to Dr. Nims, the ALJ erred by not discussing or applying the criteria

applicable under the treating physician rule and did not continue to weigh Dr. Nims' opinions under the remaining regulatory factors. Instead, the ALJ credited the opinions of Dr. Boerger by merely observing that his opinion was consistent with the state agency opinions and some unidentified "clinical findings of Dr. Nims...." (Tr. 22). In this manner, the ALJ did not apply or discuss the required regulatory factors, which was certainly needed in light of the opinions Dr. Nims provided.

There remains the possibility that the ALJ's errors were harmless. *See Bowen*, 478 F.3d at 747-49. A review of the opinions provided by Dr. Murray reveals that he supported his opinions with references to numerous objective medical test results and he explained his treatment of Plaintiff and opinions in detail. Because of this, ample reason existed under the regulations to credit or place significant weight on Dr. Murray's opinions. In addition, the ALJ's errors with regard to Dr. Hutson where not harmless in light of the substantial contrary opinions provided by Dr. Murray and because Dr. Hutson testimony itself contained a reason to credit Plaintiff's pain testimony. This appeared in Dr. Hutson's acknowledgement that degenerative disc disease can cause the type of pain Plaintiff testified about. *See* Tr. 416-17. In addition, Dr. Nims supported his opinions with some explanation, albeit a brief one, thus providing at least one regulatory reason for crediting their opinions. *See supra*, §II(B)(b) (and records cited therein). Consequently, the opinions provided by Plaitniff's treating medical sources were not so patently deficient that they could not be credited, *see Wilson*, 378 F.3d at 547, and this is not the "rare case"[6] in which a violation of 20 C.F.R. 404.1527(d)(2) can be deemed harmless.

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions decision are well taken.[7]

---

[6] *Bowen*, 478 F.3d at 748.

[7] Because of this conclusion, and the resulting need to remand this case for further administrative proceedings, an in-depth analysis of Plaintiff's remaining challenges to the ALJ's decision is unwarranted.

## VII.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See id*.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above.  On remand, the ALJ should be directed to evaluate the opinions of the medical sources, and to explain his evaluation, as required by the Regulations, and to determine anew, through the sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

### IT IS THEREFORE ORDERED THAT:

1.     The Commissioner's final non-disability determination be vacated;

2.     No finding be made as to whether Plaintiff William C. Dean was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law
        Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration
        consistent with this Report; and

4.      The case be terminated on the docket of this Court.


July 9, 2009

                                        _____s/Sharon L. Ovington_____
                                            Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).